(91 Misc. Rep. 640)

### STAR CO. v. WHEELER SYNDICATE, Inc.

(Supreme Court, Special Term, New York County. September, 1915.)

1. WORDS AND PHRASES—"SYNDICATING."
    "Syndicating" consists in gathering materials suitable for newspaper publication from writers and artists and distributing the same at regular intervals, in the form of matrices, to newspapers throughout the country for publication on the same day.

2. TRADE-MARKS AND TRADE-NAMES ⊕⟳95—DESIGNATION OF CARTOONS—PRELIMINARY INJUNCTION.
    Where, in a suit to enjoin the use of the words "Mutt and Jeff" in connection with cartoons constituting comic sections of newspapers, it appears that the name of the artist rather than plaintiff's newspaper is inseparably associated in the public mind with the words quoted and that his name is part of the registered trade-mark, and plaintiff's right to a trade-mark in such words as applied to a comic section is doubtful, a preliminary injunction restraining defendant from using such words to designate cartoons made by the same artist after termination of his contract with plaintiff will be denied.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 108; Dec. Dig. ⊕⟳95.]

3. TRADE-MARKS AND TRADE-NAMES ⊕⟳1—"TRADE-MARK."
    A "trade-mark" has been defined to be one's commercial signature; a word, symbol, or device by which the wares of the owner are known in trade.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 1, 3; Dec. Dig. ⊕⟳1.
    For other definitions, see Words and Phrases, First and Second Series, Trade-Mark.]

Injunction by the Star Company against the Wheeler Syndicate, Incorporated. Temporary injunction vacated.

John T. Sturdevant, of New York City (Bainbridge Colby, of New York City, of counsel), for plaintiff.

Kelley & Becker, of New York City (Charles E. Kelley, of New York City, of counsel), for defendant.

WEEKS, J.   The plaintiff seeks an injunction restraining the defendant from using the words "Mutt and Jeff" in connection with cartoons, designated as "comic strips," which are claimed to constitute comic sections of newspapers.   It is asserted that such words, used as a title, constitute a trade-mark or trade-name, ownership of which is claimed by the Star Company, and also by the artist, Harry C. Fisher, under license from whom the Wheeler Syndicate, Incorporated, claims the exclusive right to use the same.   The Star Company also asserts the right to prevent any person, without its consent, from depicting the figures of either "Mutt" or "Jeff" in comic strips, or making any sketches or representations of said characters, or using said names as designations of the comic characters or figures of "Mutt" or "Jeff."

The grotesque figure of "Mutt" first appeared in a cartoon drawn by Fisher which appeared in the San Francisco Chronicle on November 15, 1907, and the figure continued to appear in his cartoons in that newspaper until December 10, 1907, on which day the cartoon was copyrighted by Fisher.   On the following day a similar cartoon, also containing the figure of "Mutt" and drawn by Fisher, appeared in the San Francisco Examiner, and such cartoon was also copyrighted by Fisher.   On May 5, 1908, another grotesque figure called "Jeff" was introduced by Fisher in the cartoon appearing on that day in the Examiner.   Until May, 1909, Fisher continued to draw cartoons of "Mutt" and "Jeff," containing one or both figures, and the Examiner printed them with the name of the artist following the title or caption of the picture.   In this month (May, 1909) Fisher's cartoons of "Mutt" and "Jeff" first appeared in the New York American, published by this plaintiff.

On August 8, 1910, Fisher entered into an agreement with the plaintiff for a period of five years "to devote his entire time, attention, and energy to the Star Company and the publications and newspaper enterprises in which Mr. William R. Hearst is or may be interested, and to work exclusively for the Star Company and such publications and newspaper enterprises."   The Star Company, in addition to allowing Fisher to appear in vaudeville, agreed that during the life of the agreement "no one, with its consent, shall produce 'Mutt' or 'Jeff,' or any other series originated by Mr. Fisher, in any publication controlled by the Star Company or Mr. Hearst, and that it will prohibit any such publication on due notification from Mr. Fisher."

On September 22, 1910, Fisher copyrighted in book form some of the cartoons which had been theretofore published in various newspapers, together with some new ones, under the title "The Mutt and Jeff Cartoons, by Bud Fisher."   A second book under the same name, and designated "Book 2," was copyrighted by Fisher on November 1, 1911.   On November 14, 1914, Fisher applied for registration of the

title "Mutt and Jeff" as a trade-mark for a series of cartoons, and registration was granted March 9, 1915. Prior to December 11, 1914, the cartoons had invariably been published under the descriptive captions or titles as furnished by the artist with his drawings and with the words "By Bud Fisher" added to such titles. Up to that time the words "Mutt and Jeff" had never been used in the newspapers as a title.

The plaintiff, having learned that its contract with Fisher would not be renewed, prefixed to the descriptive title of the cartoon as published in the New York American on December 11, 1914, the words "Mutt and Jeff," but did not prefix those words to the title of the cartoon as published under its syndicated service in the newspapers outside of New York City. After that date the words "Mutt and Jeff" were not again used as a title until January 19, 1915, when the cartoon was published under the title: "Mutt and Jeff. By Bud Fisher"—and this style of publication continued until January 29, 1915.

[1] The cartoons in question, which are called "comic strips," may be described from the exhibits as a series of five or six pictures arranged in a strip so as to cover the width of a newspaper page, and depicting the progressive development of a situation in which the oversized "Mutt" and the undersized "Jeff" are usually the only participants, and in which the latter is usually the subject of maltreatment by the former. "Syndicating," referred to in the papers upon this motion as a business in which both the Star Company and the Wheeler Syndicate, Incorporated, are engaged, consists in gathering materials suitable for newspaper publication from writers and artists and distributing the same at regular intervals, in the form of matrices, to newspapers throughout the country for publication on the same day.

The plaintiff rests its claim upon the authority of New York Herald Co. v. Star Co. (C. C.) 146 Fed. 204, which sustained the Herald's right to a trade-mark in the words "Buster Brown" as a title or heading for a comic section of a newspaper. It was stated in that case that a comic section might consist of several pages or of a single page, or that it might be a subsection of a larger section, also comic, and that the artist who originated or drew the first figure of "Buster Brown," or any other person, was entirely free to design, draw, color, and publish comic pictures of the same kind as those to which the title had been prefixed by the owner of the trade-mark, provided the cartoons did not so closely imitate pictures already published as to amount to an infringement thereof. The opinion points out that the "Buster Brown" Case concerned only an alleged infringement of a trade-mark, and presented no question as to copyright or as to unfair competition. In these last two respects, as well as in its facts, the case is wholly dissimilar to the case at bar.

In the "Buster Brown" Case the comic figure had never been used for a newspaper cartoon or comic section prior to its use in the comic section or supplement of the Herald; neither the name nor the figure had been used by the artist theretofore, except for an advertising poster; the cartoon which was drawn in black and white by the artist Outcalt had been colored by the art department of the Herald for such publi-

cation; the application of the title to the page or section was originally made by the Herald, and was continuously used as a heading for such section for more than three years, and such title had become widely known as a distinguishing mark of the comic section issued by the Herald Company, and had been syndicated by it under that name as a comic section, and such title had been registered by the Herald Company as a trade-mark.

In the present case there has been no such original application by the Star Company of the title "Mutt and Jeff" to the pictures described as "comic strips," and no such continued and exclusive appropriation of the title to such purpose is shown. It does not appear that the cartoons have been published as a section or part of a comic supplement, or that the title has become known as a distinguishing mark of any such supplement. Both characters were created by the artist, and the names were used by him and by other newspapers in connection with comic cartoons of the same character during the years from 1907 to 1909, before the Star Company published any of the artist's work, and the characters of "Mutt" and "Jeff" were recognized by the Star Company and described in its contract of August 8, 1910, as component parts of a "series orginated by Mr. Fisher."

The distinctive title "Mutt and Jeff" was first applied to the cartoons by the artist when he copyrighted "The Mutt and Jeff Cartoons, by Bud Fisher," and the Star Company never applied the title to any cartoons published and sold by it until December 11, 1914, and even then such title was not used upon its syndicate pictures, and during the entire period, down to and including the publication of January or February, 1915, hereafter referred to, the captions or titles of the cartoons were invariably followed by the words "By Bud Fisher." The only cartoon which is annexed to the moving papers bears the title "Mut and Jeff, by Bud Fisher." This is described as "a copy of said comic strip or section bearing plaintiff's trade-name 'Mutt and Jeff,'" which had been "sold by the plaintiff throughout the period mentioned in the complaint, to wit, August 8, 1910, to the present time."

This exhibit does not in any way indicate that it formed any part of a comic section or supplement, and I understand it to be admitted that the use of these cartoons was not limited to any such section, but that they were published on the pages of general news. No date is given of the publication of this exhibit, but an examination of the printing upon the reverse side indicates that it was published shortly prior to February 3, 1915. It is apparent, therefore, that in the present case the question is not so much one of trade-mark infringement as one of unfair competition and the right to acquire a trade-mark in a name previously selected by another as the title to a copyrighted work. In an application for a preliminary injunction it is well settled that unless the right of the plaintiff is clear injunction will not issue.

[2] Under the provisions of the United States statutes relating to trade-marks it is provided (Act March 3, 1881, c. 138, § 7, 21 Stat. 503) that registration of a trade-mark is prima facie evidence of ownership. In the case at bar registration of "Mutt and Jeff" as a trade-mark is in the name of Fisher, and the plaintiff has not shown

155 N.Y.S.—50

such a clear right in itself to the trade-mark as to overcome this presumption of ownership in Fisher. The requirements necessary to be complied with before the right to a trade-mark can be sustained are stated in Jaeger's Co. v. Le Boutillier, 47 Hun, 522, as follows:

"In order to entitle a person to claim a proprietary right in any particular devices or marks attached to goods, the article to which these marks or devices has been attached must have been manufactured and produced by the person applying such marks or devices, and thus a reputation established in the market, for goods thus manufactured, in connection with the particular marks. The marks or devices thus used become a trade-mark, which becomes the property of the person who has originated it and created for it a reputation in connection with his manufactures. * * * In the case of a trade-mark, it is a mark or device attached by the manufacturer and seller of goods to the merchandise produced by him, in order to distinguish it from a like class of merchandise produced by others; and the right to the exclusive use of such mark accrues, not because he was the originator of the same, but because he has applied it to goods of his manufacture, and they have acquired a reputation in connection with such mark."

The reputation acquired for these cartoons was not a reputation established in the market for a comic strip manufactured and produced by the Star Company and to which it had attached the mark or device of "Mutt and Jeff" in order to distinguish it from a like class of merchandise produced by others. It was rather a reputation established in the market for a comic strip containing the grotesque figures of "Mutt and Jeff, by 'Bud' Fisher." The designation of authorship was a part of the trade-mark, if trade-mark there was. The reputation which was established was a reputation which entitled the public, constituting the market, to expect to receive and enjoy the humor of the author and the skill of the artist to which it had become accustomed.

If there were any doubt as to the words "Mutt and Jeff" being inseparably associated in the public mind with the artist rather than with the newspaper, it is entirely dispelled by the letters produced by the Star Company. Under date of April 7, 1915, one of the former subscribers to its syndicated service writes:

"In regard to 'Mutt and Jeff,' we have signed a contract with the Wheeler Syndicate for this feature, * * * as we understand from them that they had made a contract with Fisher for this stuff."

Another subscriber writes under date of July 23d:

"Last April I was in your office and talked with you on the comic Mutt and Jeff. At that time I was assured that you were arranging to have this cartoon drawn, and that it would be furnished within a very few weeks. We have heard nothing from you. * * * We notice the announcement of the Wheeler Syndicate * * * that Bud Fisher will draw Mutt and Jeff. * * * If you are not going to be in a position to furnish this cartoon, we would at least like to know if there will be any legal complications between you and Mr. Fisher, or between you and the Wheeler Syndicate. We think we are at liberty to purchase this cartoon from them."

Similar letters received by the Wheeler Syndicate refer to the cartoons as Bud Fisher's comics, Bud Fisher cartoons, Bud Fisher service, Bud Fisher stuff, Bud Fisher matter, Fisher's Mutt and Jeff, Fisher's Mutt and Jeff service, Bud Fisher feature, Bud Fisher comic

cartoons, Bud Fisher strips, and Bud Fisher comic service. Another writes:

"We have been running the Mutt and Jeff features for some years, but learn that Mr. Fisher has made a contract with you for his work in the future."

[3] A trade-mark has been defined to be "one's commercial signature," and in discussing the question as to whether an author could protect his writings by a trade-mark the court said in Kipling v. G. P. Putnam's Sons, 120 Fed. 631, 635, 57 C. C. A. 295, 299 (65 L. R. A. 873):

"A trade-mark is a word, symbol, or device by which the wares of the owner are known in trade. Its object is, first, to protect the party using it from competition with inferior articles; and, second, to protect the public from imposition. The trade-mark brands the goods as genuine, just as the signature to a letter stamps it as authentic."

As stated in G. & C. Merriam Co. v. Saalfield, 198 Fed. 369, 372, 117 C. C. A. 245, 248:

"A trade-mark is a trade-mark because it is indicative of the origin of the goods. The original right to its exclusive use was not based upon any statute, but upon principles of equity; and the right is acquired, not by discovery or invention or registration, but by adoption and use. The entire substantive law of trade-marks (excepting statutory provisions and construction) is a branch of the broader law of unfair competition. The ultimate offense always is that the defendant has passed off his goods as and for those of the complainant."

Applying these principles, I am convinced that the right of the Star Company to a trade-mark in the words "Mutt and Jeff," as applied to a comic section or strip, is so doubtful, and the danger of deceiving the public is so great, that no preliminary injunction should issue. The temporary injunction is therefore vacated, with $10 costs.

Ordered accordingly.