## CITY OF HARTFORD *v.* ASSOCIATED CONSTRUCTION COMPANY ET AL.

SUPERIOR COURT      HARTFORD COUNTY      FILE No. 195272

Memorandum filed January 9, 1978

*Gross, Hyde & Williams,* for the plaintiff.

*Ribicoff & Kotkin,* for the defendants Skyway All-Weather Crete Company and Silbrico Corporation.

BIELUCH, J. The plaintiff brought this action against multiple defendants for property damage resulting from the leaking roof of a school constructed in 1969 and for expenses in repairing and replacing the roof. In the fourth count of the complaint, as amended, the plaintiff alleges the following cause of action against the defendant Silbrico Corporation, hereinafter referred to as Silbrico: (1) "All-Weather Crete" is a registered trademark of the defendant; (2) Silbrico formulated, designed, advertised, manufactured, distributed, sold, nationally promoted, and issued specifications and instructions for the product known as "All-Weather Crete," an insulating base for built-up roofing systems; (3) Silbrico licensed the application and use of its registered trademark "All-Weather Crete" throughout the United States and Canada and made "All-Weather Crete" available through its licensees only; (4) under its licensing agreements, and specifically in the present case under its agreement with Skyway All-Weather Crete Company, hereinafter called Skyway, Silbrico retained and exercised rights of control as to the quality of "All-Weather Crete" as well as the methods and manner of its application; (5) Silbrico derived substantial economic benefit from payments by licensed applicators, including Skyway, under its licensing agreements; (6) Silbrico derived further financial benefit from the sales of perlite ore which it mined and sold to its licensees for use as a necessary component of "All-Weather Crete"; (7) Skyway, as a licensee of Silbrico, purchased perlite ore from Silbrico which it used along with other raw materials to mix and prepare "All-Weather Crete" at the plaintiff's school construction site; (8) Skyway applied the prepared "All-Weather Crete" to the roof deck of the school following the standards and specifications of Silbrico; (9) the "All-Weather Crete" applied to the roof deck of the plaintiff's school was

in a condition which conformed to the product formula, specifications and description as provided in the design or product formulation, advertisements, promotional material and trademark licensing agreement of Silbrico; (10) the "All-Weather Crete" so applied was unsafe and in a defective condition unreasonably dangerous to the property of the user or consumer in that moisture would be and was introduced into it and with changes in temperature large cracks and crevices would develop, creating tears in the roofing membrane and causing the roof to leak; (11) numerous leaks and other deterioration of the roofing membrane on the plaintiff's school resulted from the defective design, formulation and specifications for "All-Weather Crete"; and (12) because and as a result of the defects and inadequacies of "All-Weather Crete," the plaintiff has suffered damages for which Silbrico is liable to the plaintiff.

Silbrico has demurred to this cause of action on the ground that it fails to allege a necessary element of a claim for strict liability in tort, namely, "that a defective product was expected to and did reach the plaintiff without substantial change in the condition in which it was sold."

The fourth count of the plaintiff's complaint alleges a cause of action against Silbrico based on strict tort liability. The sole question presented to the court by the defendant's demurrer is whether the cause of action is sufficiently alleged.

The rule of strict tort liability has been codified as § 402 A of volume 2 of the Restatement (Second) of Torts, entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer," which reads as follows: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby

caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The law of strict tort liability as defined in § 402 A has been expressly approved in Connecticut in *Garthwait* v. *Burgio,* 153 Conn. 284, 289–90. The minimum essential affirmative allegations of a cause of action based on this theory of the strict liability of a manufacturer or seller of a product to an ultimate user or consumer were subsequently defined in *Rossignol* v. *Danbury School of Aeronautics, Inc.,* 154 Conn. 549, 561–62, as consisting of the several conditions precedent to liability specified in § 402 A. The court there observed that the seller's liability is not absolute and concluded (p. 562) that "[s]ince the present complaint contains no allegation that the product . . . was expected to and did reach the plaintiff without substantial change in the condition in which it was sold . . . it lacks an allegation which is essential to the statement of a good cause of action based on strict tort product liability." In a later case the court affirmed that a plaintiff cannot prevail in strict tort liability without alleging and proving this and all other essential elements of the cause of action. *Guglielmo* v. *Klausner Supply Co.,* 158 Conn. 308, 316.

Silbrico has relied upon *Rossignol* and *Guglielmo* for support of its demurrer. The defendant maintains that the allegation that it furnished a raw material, namely perlite ore, which was not in itself

defective, to its licensee as a necessary component of "All-Weather Crete" did not save the complaint from attack by demurrer. Furthermore, the defendant argues that "a product design is not a 'product' within the meaning of the strict liability in tort doctrine."

The plaintiff counters that sufficient allegations for strict tort liability are contained in the count: the product involved in this claim was initially developed and thereafter promoted by Silbrico under a registered trademark, "All-Weather Crete"; the specifications for the composition of "All-Weather Crete" and the instructions for its use were promulgated by Silbrico to its licensees; "All-Weather Crete" was available only through such licensed applicators as Skyway, over whom Silbrico retained and exercised rights of control as to the quality and the methods and manner of application of the product; Silbrico furnished a component material necessary under its licensed formula; Silbrico's licensing agreements constituted all-extensive involvement with its trademark-registered product, "All-Weather Crete," even to the actual final mixture and site installation of it by the licensee under Silbrico's specifications and control; and finally, by Silbrico's licensing agreement with Skyway, its trademark-registered product, "All-Weather Crete," entered the stream of commerce and flowed ultimately onto the plaintiff's school roof, to the physical harm and loss of the plaintiff and to the two-fold financial benefit of Silbrico with income accruing to it both from its licensing arrangement and from the sale of a necessary ingredient to Skyway as its licensee.

The plaintiff, in substance, seeks to impose strict liability upon the owner of a registered trademark who has licensed its composition and use by a franchise agreement with another and thereby caused

harm to the property of the ultimate user or consumer of the trademarked product. The claim is unique. It is without precedent or parallel. The issue is, however, of great importance to the commercial marketplace in the light of the contemporary popularity of franchise agreements for the manufacture and sale by licensees of trademarked products in designated territories in substitution for the traditional direct marketing of goods by the trademark owners. It was inevitable that the continuous growth of franchised businesses should present this question for judicial determination. The marketplace is the common denominator of franchising as a fact and strict tort liability as a law, and the two were bound to join in issue for resolution by the court.

A single reported case, while not matching the facts here before the court, is of relevance because it does approach the issue raised by the plaintiff. It is the decision rendered in 1972 by an intermediate appellate court in California in *Kasel* v. *Remington Arms Co.*, 24 Cal. App. 3d 711. There a California hunter sued for personal injuries caused by the explosion of a shotgun shell during a hunting trip in Mexico. The action was based on strict liability under § 402 A and was brought against Remington Arms Company, Inc., a Delaware corporation having its home office in Connecticut, for a defective shell manufactured by CDM, its trademark licensee in Mexico. Remington had caused CDM to be created, owned 40 percent of its outstanding stock, and had interlocking or common directors and officers. Also, in furtherance of its plans for CDM, Remington had entered into three agreements with CDM relating to the manufacture and marketing of ammunition under Remington's trademarks: (1) a trademark license agreement, (2) a contract for the sale of technical information,

and (3) a technical services contract. Under the trademark license agreement Remington retained the right to inspect and control the quality of all ammunition on which its trademarks were used. The other two contracts provided, respectively, for the sale of scientific processes and for the training and furnishing of personnel.

The trial court refused to instruct the jury relative to the plaintiff's theory for imposing strict liability in tort upon Remington as "an integral part of the overall producing and marketing enterprise of the defective product." A verdict for the defendant followed. On appeal the court reversed the judgment and remanded the case for retrial stating (p. 723): "It is our opinion that the trial court erred in limiting the application of strict liability in tort to a factual finding of either actual manufacture by Remington or an agency relationship between CDM and Remington. The evidence of Remington's involvement in the 'enterprise' was uncontradicted and was sufficient so that the trial court should have found as a matter of law that Remington was an integral part of the composite business enterprise which placed the defective shell in the stream of commerce, and should have instructed the jurors that it would be strictly liable if they found: (1) that the shell had been placed on the market under circumstances wherein it was known that it would be used without inspection for defects, (2) that the injury was caused by a defect which, unbeknown to plaintiff, made it unreasonably dangerous for its intended use, and (3) that it was being used for the purpose for which it was designed."

The plaintiff, while conceding the factual variances in *Kasel* maintains that there is sufficient identity of circumstances in Silbrico's modus operandi to bring it within the court's holding (p. 725):

"Plaintiff has cited no cases and we have found none which apply strict liability in tort upward to a franchisor, or a trademark licensor as in the instant case. Although the agreements between Remington and CDM were not labeled franchise agreements, the analogy is pertinent because the licensing of trademarks and the sale of technical know-how are the backbone of most franchising operations. . . . However, as long as the franchisor or trademark licensor can be said to be a link in the marketing enterprise which placed a defective product within the stream of commerce, there is no reason in logic for refusing to apply strict liability in tort to such an entity."

When attacked by demurrer, the complaint is construed in the manner most favorable to the pleader. *McAdam* v. *Sheldon,* 153 Conn. 278, 280. The allegations are entitled to the same favorable construction as a trier would be required to give in admitting evidence under them, and if facts provable under the allegations would support a cause of action, the demurrer must fail. *Cyr* v. *Brookfield,* 153 Conn. 261, 263.

Trademarks in interstate commerce are governed by the Lanham trademark act of 1946, 15 U.S.C. § 1051. That act was designed for the mutual benefit of the public and trademark owner. In purchasing a product protected by a registered trademark, the consumer may be confident that he will get the item which he asks for and wants to get. *Mariniello* v. *Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir.), quoting from the senate report accompanying the Lanham act.

The owner of a trademark used in connection with goods in commerce may register his trademark in the United States patent and trademark office. 15

U.S.C. § 1051. "All-Weather Crete" is a trademark so registered by Silbrico. That registration is constructive notice of Silbrico's claim of ownership of the trademark. 15 U.S.C. § 1072. By registering a trademark the owner establishes his exclusive right to use the registered mark in commerce on the goods specified in the registration. 15 U.S.C. § 1115.

"The term 'trade-mark' includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127. The statutory requirement is not that a trademark identify what the goods are, but where they come from. *Application of E. Kahn's Sons Co.*, 343 F.2d 475, 476 (Court of Customs and Patent Appeals). A trademark is an arbitrary symbol which is affixed by the manufacturer, or by one who has his products manufactured, to a vendible product, and which designates and distinguishes that product and protects the manufacturer's good will, existing because of his business and the quality of his product. *Pacific Supply Cooperative* v. *Farmers Union Central Exchange, Inc.*, 318 F.2d 894, 905 (9th Cir.). It brands the goods as genuine, just as the signature to a letter stamps it as authentic. *Star Co.* v. *Wheeler Syndicate, Inc.*, 91 Misc. 640, 648 (N.Y.), citing *Kipling* v. *G. P. Putnam's Sons*, 120 F. 631, 635 (2d Cir.). The use of a trademark is a merchandising shortcut which induces a purchaser to select what he wants, or what he has been led to believe he wants. *Mishawaka Mfg. Co.* v. *Kresge Co.*, 316 U.S. 203, 205. In the commerce of goods a registered trademark serves three functions—as an indication of origin, as a guarantee of quality and as a medium of advertisement. *DeCosta* v. *Columbia Broadcasting System, Inc.*, 520 F.2d 499, 512 (1st Cir.).

A trademark owner may extend the territory in which he has the right to exclusive use of his trademark either by expanding his own operations or by introducing his trademark and creating a demand for his goods in new territory through licenses subject to his control. The licensee thereby acquires only the right to a limited use of the trademark, and the control, right and title to the product remain in the licensor. Correlative to the right of an owner to license his trademark to others is his affirmative duty to himself and to the public to exercise control and restraint upon his licensees to prevent losing his property rights thereunder. *Denison Mattress Factory* v. *Spring-Air Co.*, 308 F.2d 403, 409 (5th Cir.). Under 15 U.S.C. § 1055, the use of a registered trademark by a related company "shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public." A "related company," as defined in 15 U.S.C. § 1127, includes any person who "is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used." It is clear, therefore, that controlled licensing does not constitute an abandonment of the owner's registration of a trademark. Naked licensing, that is to say, licensing without the exercise of supervision by the licensor, on the other hand, may constitute an abandonment. The reason for the distinction is that the risk that the public will be deceived is minimized and the purpose of the law is effectuated when the licensor exercises supervision and control over the operations of his licensees. *R.C.W., Supervisor, Inc.* v. *Cuban Tobacco Co.*, 220 F. Sup. 453, 461 (S.D. N.Y.).

The use of the registered trademark "All-Weather Crete" was licensed by Silbrico, in accordance with the provisions of the law, to Skyway as a related

company under its control with reference to the nature and quality of the roofing base product identified by that trademark. Notice of the registration of this trademark was given by Skyway to the plaintiff by displaying with the mark "All-Weather Crete," as used, the letter R enclosed with a circle, a manner of public notification permitted by 15 U.S.C. § 1111. The obligations to the plaintiff of Silbrico, as the licensor of the trademark "All-Weather Crete" to Skyway, were expressed in *Morse-Starrett Products Co.* v. *Steccone,* 86 F. Sup. 796, 805 (N.D. Cal.): "If the owner of a trademark wants to license the use thereof to another and still retain as his own the enjoyment of the rights stemming therefrom, he must do so in such a way that he maintains sufficient control over the nature and quality of the finished product, over the activities of the licensee, as will enable the licensor to sustain his original position of guarantor to the public that the goods now bearing the trademark are of the same nature and quality as were the goods bearing the trademark before the licensing, or, that the mark now has the same meaning as far as the public is concerned as it did before the licensing."

This legal responsibility to the plaintiff imposed upon Silbrico as a result of its licensing agreement with Skyway, guaranteeing to the consumer that the roofing base insulation branded by the trademark "All-Weather Crete" was of the same nature and quality as was the product before its licensing to Skyway, meets the condition precedent for strict tort liability under § 402 A that the defective product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." The plaintiff's fourth count sufficiently states the trademark licensing agreement between Silbrico and Skyway and Silbrico's retention and exercise thereunder of rights of con-

trol as to the quality of "All-Weather Crete" as well as to the methods and manner of its application. Therefore, it effectively contains the aforementioned essential element for strict product liability upon which the defendant's demurrer is grounded and alleges a good cause of action.

The conclusion reached by the court in the factual situation before it may also be obtained from the conjunction of the rule of strict liability embodied in § 402 A with the earlier provision for liability expressed in § 400 of volume 2 of the Restatement (Second) of Torts, entitled "Selling as Own Product Chattel Made by Another." Section 400 states: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Comment *d* thereunder, in its explanation of the principle's limitations, illustrates the applicability of the rule to the owner of a trademark used on a product in these clear terms: "The rule stated in this Section applies only where the actor puts out the chattel as his own product. . . . [O]ne puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark."

Section 400, identified previously as § 270 of the Restatement of the Law of Torts, Tentative Draft No. 5, has been accepted for application in Connecticut. *Burkhardt* v. *Armour & Co.,* 115 Conn. 249, 264. Referring to the comment as then expressed for that proposed rule and to the facts of the case cited and depicted as illustrative of it, the Supreme Court made the observation (p. 265): "In the case before us there is present the additional element of the use and display of the Armour trade-mark, the ordinary significance of which is that the owner of the mark stands sponsor for the goods so marked and vouches for the product as

his own." As a result of the ruling in *Burkhardt* v. *Armour & Co.*, supra, comment *d* of § 400 has been redrafted in the present text, as quoted above, to interpret the use of a trademark as calling for the rule's applicability, and the factual situation of the *Armour* case has been recited in the Restatement as another illustration of liability under the provisions of the section.

Section 400 of volume 2 of the Restatement (Second) of Torts was adopted by the American Law Institute in its original codification of the law of torts in 1934. It was then assigned its present number. Its purpose was to extend the tort liability of a product manufacturer to one who puts the product out in the marketplace or commerce as his own. The affixation of one's trademark to a product manufactured by another constitutes such putting out of the product as his own. Section 402 A, adopted about twenty years later in the second edition of the Restatement of Torts, attaches strict tort liability to any manufacturer of a product for use or consumption. This subsequent creation of strict tort liability against a product manufacturer constitutes additional manufacturer's liability attaching to those subject to such liability under § 400. Neither section excludes this conclusion by its provisions or respective comments. In fact, such a holding is inclusive within the terms and consistent with the comprehension of the two rules in conjunction with each other.

As noted earlier, the California court in *Kasel* v. *Remington Arms Co.*, 24 Cal. App. 3d 711, 725, observed that "as long as the franchisor or trademark licensor can be said to be a link in the marketing enterprise which placed a defective product within the stream of commerce, there is no reason in logic for refusing to apply strict liability in tort to such an entity." The court in that case makes

reference to a law journal note entitled "Tort Liability of Trademark Licensors," 55 Iowa L. Rev. 693, in which the author argues for an extension of products liability to include trademark licensors. After reviewing the rationale of strict tort liability, the law review writer made these comments (p. 706) relevant to the issue before this court: "[T]here is no reason why the strict tort liability analysis could not be expanded to include the licensor of a trademark. As an important factor in supplying goods, the trademark owner is engaged in an activity in which experience dictates that some injuries can be anticipated. If he were himself producing the product, it is likely that the strict tort analysis would be applicable. It seems not to be in the public interest to allow one to escape this responsibility through the simple maneuver of entering a licensing agreement."

The demurrer of the defendant Silbrico to the fourth count of the plaintiff's complaint is overruled.