Andrew TORRES; Amanda Torres, husband and wife; Walter Torres; Debra Torres, Plaintiffs–Appellants,

v.

GOODYEAR TIRE & RUBBER COMPANY, INC., an Ohio Corporation, Defendant–Appellee.

No. 87–2062.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 18, 1988.

Decided Feb. 15, 1989.

Richard D. Engler, Engler, Engler, Weil & Nelson, Yuma, Ariz., for plaintiffs-appellants.

Jefferson L. Lankford, Jennings, Strouss & Salmon, Phoenix, Ariz., for defendant-appellee.

Before SNEED, HALL and NOONAN, Circuit Judges.

## ORDER

The opinion in this case, filed September 15, 1988, and appearing at 857 F.2d 1293, is hereby withdrawn and the following "Opinion and Order Certifying Question to the Arizona Supreme Court" is substituted.

The opinion having been withdrawn, the petition for rehearing is rendered moot. The full court having been advised of the suggestion for rehearing en banc, and no active judge having called for rehearing en banc, the suggestion for rehearing en banc is rejected.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Plaintiffs-appellants the Torreses sue to recover for personal injuries suffered as a result of an automobile accident. The Torreses assert four theories under which they believe defendant-appellee Goodyear Tire & Rubber Company ("Goodyear") should be held liable for their injuries: (1) the "apparent manufacturer" doctrine; (2) principles of apparent agency or agency by estoppel; (3) the Arizona law of manufacturers' warranties; and (4) the "enterprise theory" of strict products liability.

The district court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (1982). The district court granted summary judgment in favor of Goodyear, concluding that "neither the Arizona courts nor the Arizona legislature have accepted the expansive liability doctrines argued by the plaintiffs."

We have jurisdiction pursuant to 28 U.S. C. § 1291 (1982). As to appellants' first three theories of liability, we affirm the district court's summary judgment in favor of Goodyear. Whether appellants may rely on an "enterprise theory" to hold Goodyear strictly liable for their injuries is a question we certify to the Arizona Supreme Court pursuant to Ariz.Sup.Ct.R. 27 (1988).

### I

The pertinent facts, briefly stated, are as follows. Andrew and Walter Torres were injured in an automobile accident allegedly caused by the tread separation of a tire on an automobile driven by Walter, a 1977 Triumph manufactured in Great Britain. The tire was original equipment on the automobile which was purchased by Walter's wife, Debra. The car's allegedly defective tire bore the legend "Goodyear."

The tire was manufactured in Wolverhampton, England by Goodyear Tyre & Rubber (Great Britain), Ltd. ("Goodyear GB"). Goodyear International Technical Center ("Goodyear Technical Center"), a division of Goodyear SA of Luxembourg, designed the tire. Either Goodyear SA of Luxembourg or Goodyear GB issued the tire specifications. According to the Torreses, Goodyear operates its foreign subsidiaries, with the exception of its Canadian subsidiary, through Goodyear International Corporation.

Goodyear GB, Goodyear SA of Luxembourg, and Goodyear International Corporation are all Goodyear subsidiaries. Because Goodyear owns most or all of its subsidiaries' stock, it is able to elect the corporate directors and thereby control the subsidiaries. There is commonality between some of the officers and directors of Goodyear and its subsidiaries.

Goodyear's support for its tires extends from research and development to trademark licensing, and from warranting to advertising. Goodyear's trademark is registered and its use is conditioned on Goodyear's control of the manufacturer. Good-

year is responsible for quality assurance and control of all tires manufactured by its foreign subsidiaries. It will honor any valid warranty claim on a tire that bears a Goodyear trademark and is produced by either Goodyear or a foreign subsidiary.

Pursuant to a licensing agreement with Goodyear, Goodyear GB may manufacture tires bearing the Goodyear trademark. The Licensing Agreement provides for manufacture of the tires in accordance with the formulas, specifications, and directions given by Goodyear. Only materials approved by Goodyear may be used. Goodyear GB must comply with Goodyear's instructions on production, labeling, marketing, and packaging of these tires.

## II

We review the grant of summary judgment *de novo*. *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied*, — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Under Fed.R. Civ.P. 56(c), summary judgment is appropriate if the pleadings and supporting materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

As a federal court sitting in diversity, we must apply Arizona substantive law. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We review *de novo* the district court's determination of the applicable state law. *In re McLinn*, 739 F.2d 1395, 1400 (9th Cir.1984) (en banc).

## III

■ The Torreses contend that Goodyear should be held strictly liable under section 400 of the Restatement (Second) of Torts because it was the apparent manufacturer of the tire. Section 400 states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

We reject this argument. First, Arizona has not adopted the apparent manufacturer doctrine. Second, even if section 400 were adopted by the Arizona Supreme Court, Goodyear did not "put out" the allegedly defective tire within the section's meaning. The cases which apply the apparent manufacturer doctrine demonstrate that section 400 applies only where a retailer or distributor has held itself out to the public as the manufacturer of the product. *See Dudley Sports Co. v. Schmitt*, 151 Ind.App. 217, 279 N.E.2d 266 (1972) (distributor); *Burkhardt v. Armour & Co.*, 115 Conn. 249, 161 A. 385 (1932) (suppliers of canned meat). *Accord Affiliated FM Ins. Co. v. Trane*, 831 F.2d 153, 155–56 (7th Cir.1987); *Nelson v. International Paint Co.*, 734 F.2d 1084, 1087–90 (5th Cir.1984) (trademark licensor does not "put out" a chattel within the meaning of section 400).

Goodyear was not the manufacturer of the allegedly defective tire. Furthermore, Goodyear was not the seller of the tire to which section 400 imputes the actual manufacturer's liability. Accordingly, the Torreses' reliance on section 400 to impose liability on Goodyear is misplaced.

## IV

■ The Torreses next assert that principles of apparent agency or agency by estoppel compel treatment of Goodyear GB as an agent of Goodyear. In Arizona, the touchstone of apparent agency is the "conduct of a principal that allows a third party reasonably to conclude that an agent is authorized to make certain representations or act in a particular way." *Miller v. Mason–McDuffie Co. of So. Cal.*, 153 Ariz. 585, 589, 739 P.2d 806, 810 (1987) (en banc). "[I]f the principal's conduct creates apparent authority, the principal is subject to liability for the agent's actions even if the agent was acting for his own purposes." *Id.* As to this theory, Goodyear has shown that there is no genuine issue of material fact.

The Torreses have pointed to no evidence that Goodyear created the impression that Goodyear GB acted as its agent. Goodyear advertising might create the impression

that tires with the Goodyear trademark are of outstanding quality. That impression, however, in and of itself does not reasonably lead to the conclusion that anyone using the Goodyear trademark is a Goodyear agent whose corporate separateness should be disregarded.

Even if the Torreses could demonstrate that there was a material dispute of fact about whether Goodyear represented Goodyear GB as its agent, they must still show that Debra Torres, when she purchased the Triumph together with its Goodyear tires, reasonably relied upon the agent's apparent authority. *Id.* at 590, 739 P.2d at 811; *Koven v. Saberdyne Systems, Inc.,* 128 Ariz. 318, 322, 625 P.2d 907, 911–12 (Ct. App.1980). The Torreses cannot claim, however, that Debra Torres believed that Goodyear GB acted as an agent of Goodyear. When she purchased the Triumph, she was unaware of Goodyear GB.

### V

■ The Torreses also attempt to base Goodyear's liability upon two warranty theories derived from *Flory v. Silvercrest Industries, Inc.,* 129 Ariz. 574, 633 P.2d 383 (1981) (en banc). As to these theories as well, Goodyear was entitled to summary judgment. Neither theory supports the Torreses' claim because both are based upon an express warranty given by the manufacturer. Here, the Torreses have presented no evidence of a similar warranty by Goodyear. Moreover, Goodyear was not the manufacturer of the defective tire and the record is clear that Debra Torres did not rely on any Goodyear warranty in purchasing the Triumph, which happened to have Goodyear tires.

### VI

■ Finally, the Torreses claim that Goodyear is liable under an "enterprise theory" of strict products liability. The district court found that this claim lacked an essential element of strict liability under Arizona statutory and case law: the defendant must have designed, manufactured or sold the defective product.

Arizona has adopted section 402A of the Restatement (Second) of Torts which imposes strict liability on "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property." In *Tucson Industries, Inc. v. Schwartz,* 108 Ariz. 464, 501 P.2d 936 (1972), the Arizona Supreme Court explained strict liability as a rule placing the burden of loss on " 'those persons who are in the chain of placing defective goods on the market.' " *Id.* at 467, 501 P.2d at 939 (quoting *Caruth v. Mariani,* 11 Ariz.App. 188, 192, 463 P.2d 83, 87 (1970)). "Strict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know-how to remove its defects before placing it in the chain of distribution." *Id.* 108 Ariz. at 467–68, 501 P.2d at 939–40. We find no support in Arizona law, however, for the Torreses' argument that we should deduce from these policy statements a willingness on the part of the Arizona Supreme Court to impose strict liability on trademark licensors.

Arizona's product liability statute, Ariz. Rev.Stat.Ann. §§ 12–681 to 12–686 (1982), defines a "product liability action" as one "brought against a manufacturer or seller of a product...." "Manufacturer" and "seller" are defined as follows:

"Manufacturer" means a person or entity who designs, assembles, fabricates, produces, constructs or otherwise prepares a product or component part of a product prior to its sale to a user or consumer, including a seller owned in whole or significant part by the manufacturer or a seller owning the manufacturer in whole or significant part.

"Seller" means a person or entity, including a wholesaler, distributor, retailer or lessor, engaged in the business of leasing any product or selling any product for resale, use or consumption.

Ariz.Rev.Stat.Ann. § 12–681(1), (5).

In addition to "manufacturers" and "sellers," Arizona courts have found a variety of entities to be integral parts of an enterprise responsible for placing allegedly de-

fective products on the market: a lessor, *Sequoia Mfg. Co. v. Halec Constr. Co.*, 117 Ariz. 11, 570 P.2d 782 (Ct.App.1977); a dealer in used goods, *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 660 P.2d 1236 (Ct.App.1983); a retailer, *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968) (en banc); a jobber, *Tucson Industries, supra;* a distributor, *Lunt v. Brady Mfg. Corp.*, 13 Ariz.App. 305, 475 P.2d 964 (1970); and a packager, *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (Ct. App.1978). However, no Arizona court has considered the precise issue of whether a trademark licensor is strictly liable for personal injuries caused by a defective product bearing its trademark.

In other jurisdictions that have considered the issue, some courts have concluded that strict liability should attach to the trademark licensor as one within the "stream of commerce" in which the product flows. *See Connelly v. Uniroyal, Inc.*, 75 Ill.2d 393, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979), *cert. denied and appeal dismissed*, 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980); *City of Hartford v. Associated Construction Co.*, 34 Conn. Supp. 204, 384 A.2d 390 (Super.Ct.1978); *Kasel v. Remington Arms Co.*, 24 Cal.App. 3d 711, 101 Cal.Rptr. 314 (1972). *Accord Kosters v. Seven–Up Co.*, 595 F.2d 347 (6th Cir.1979) (applying Michigan law, franchisor liable under implied warranty theory); *Harris v. Aluminum Co. of America*, 550 F.Supp. 1024 (W.D.Va.1982) (applying Virginia law, same); *Taylor v. General*

*Motors, Inc.*, 537 F.Supp. 949 (E.D.Ky. 1982) (applying Kentucky law, strict liability applies to one exercising strict control over design and testing of defective product); *Carter v. Joseph Bancroft & Sons Co.*, 360 F.Supp. 1103 (E.D.Pa.1973) (applying Pennsylvania law, trademark licensor strictly liable as "seller"). Some commentators have agreed. *See* 2 L. Frumer & M. Friedman, *Products Liability* § 3.03[4][b][viii] at 3–456 (1988); Note, *Tort Liability of Trademark Licensors*, 55 Iowa L.Rev. 693 (1970).

In this case, however, we hesitate prematurely to extend the law of products liability in the absence of an indication from the Arizona courts or the Arizona legislature that such an extension would be desirable.[1] This case presents another opportunity to enhance the "insurance coverage" of section 402A of the Restatement available to those whose claims are governed by Arizona law. In roughly a quarter of a century since section 402A made its appearance, its reach has been extended by many states. We would be a part of that trend were we "to find" that Arizona would do so in this instance were this case before one of its courts.

Things are not what they were twenty-five years ago, however. We must acknowledge that few products are accident and defect free. It also is now realized that the cost of 402A insurance is very substantial.[2] It is a significant part of the cost of many items.[3] Included within this "premium" paid by all consumers is a sig-

---

1. We note that the rule in other circuits is that the federal courts have limited discretion in a diversity case "to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co.*, 831 F.2d at 155 (7th Cir.1987). *See also Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 694–95 (1st Cir.1984); *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. Unit A 1980). The unwillingness of these courts to speculate on any trends in state law "applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court." *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987); *see Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985). For better or for worse, this circuit has not seen fit to assume such a posture of restraint when it comes to deciding novel questions of state law. *See Paul ·v. Watchtower Bible & Trust Society*, 819 F.2d 875, 879 (9th Cir.1987).

2. *See* Priest, *The Current Insurance Crisis and Modern Tort Law*, 96 Yale L.J. 1521, 1534–39 (1987); O'Connell, *Alternatives to the Tort System for Personal Injury*, 23 San Diego L.Rev. 17, 21 (1986); Epstein, *Products Liability as an Insurance Market*, 14 J.Legal Stud. 645, 668–69 (1985); Sugarman, *Doing Away with Tort Law*, 73 Calif.L.Rev. 555, 596 (1985).

3. P. Huber, *Liability: The Legal Revolution and its Costs* 165–69 (1988).

nificant amount for legal costs.[4] We are approaching the time when fundamental assumptions with respect to section 402A will be reexamined. Questions will be raised such as: Should universal compensation for injuries not self-inflicted be provided by a form of national accident insurance exclusively? Or should such a plan employ a combination of (a) national accident insurance, (b) individual accident insurance, (c) and a tort system based on fault? If these are visionary, should section 402A be redrawn so as to make its outer limits more precise? Or should we merely halt for the present the expansion of section 402A by judicial decision?

The answers to these questions do not come easily, a fact that reveals the difficulty in which we find ourselves at this point in the development of products liability law generally and with respect to this case. An additional complexity is that each state has an incentive to make available to its inhabitants all the possible benefits of section 402A's coverage. To do otherwise may be to incur the risk of depriving a potential insured of the coverage for which he or she has paid.

Nonetheless, this is a choice we are reluctant to make for the State of Arizona. Therefore, we order that the following question be certified to the Arizona Supreme Court, pursuant to Ariz.Sup.Ct.R. 27 (1988): whether a trademark licensor is subject to strict product liability under section 402A of the Restatement (Second) of Torts (made the law of Arizona in *Tucson Industries, Inc. v. Schwartz,* 108 Ariz. 464, 501 P.2d 936 (1972)) by reason of being either (a) a "manufacturer" or "seller" within the meaning of Ariz.Rev.Stat.Ann.

§§ 12–681 to 12–686 (1982), or (b) an "integral part of an enterprise" responsible for placing allegedly defective products on the market. *See O.S. Stapley Co. v. Miller,* 103 Ariz. 556, 447 P.2d 248 (1968) (en banc), and its progeny.

AFFIRMED in part; question of Arizona law CERTIFIED to the Arizona Supreme Court.

NOONAN, Circuit Judge, concurring and dissenting:

I agree with the court that Goodyear cannot be held liable for the injuries in this case under a warranty theory, an agency theory, or as one "putting out" a product under section 400 of the Restatement (Second) of Torts. I also agree with the court that it is appropriate to certify a question to the Supreme Court of Arizona. However, the court's phrasing of the question is too narrow.

In 1964 the American Law Institute adopted § 402A of the Restatement (Second) of Torts. It provided that the seller of a product in a defective condition unreasonably dangerous to the users was liable for the physical harm caused by the product to the ultimate users if the seller was in the business of selling the product and it was expected that the product would reach the user without substantial change in the condition in which it was sold. The rule applied although the user was not in any contractual relation with the seller.

The rationale for the rule was that "by marketing his product for use and consumption" the seller had undertaken a special responsibility toward the user; that the public in buying goods where it was forced

---

**4.** One commentator has estimated that only thirty-seven cents of each products liability insurance dollar goes to victims while the balance pays for insurance overhead and legal fees. *See* O'Connell, *supra* note 2, at 21. Other statistical studies have made similar findings. The Rand Corporation, for example, has concluded that legal fees and expenses alone account for thirty-eight percent of the average costs and compensation in a non-auto tort lawsuit, which provides a rough estimate for the costs of product liability lawsuits. *See* S. Kakalik & M. Pace, *Costs and Compensation Paid in Tort Litigation* 74 (Rand Corp./Institute for Civil Justice 1986);

Hensler, *Trends in Tort Litigation: Findings from the Institute for Civil Justice's Research,* 48 Ohio St.L.J. 479, 493 (1987). The Rand Corporation also has estimated that legal costs account for sixty-three percent of the total expense for costs and compensation in certain kinds of lawsuits, such as asbestos lawsuits, in which many plaintiffs rely on a theory of products liability. *See* D. Hensler, W. Feldstiner, M. Selvin, & P. Ebener, *Asbestos in the Courts: The Challenge of Mass Toxic Torts* 45 & n. 16 (Rand Corp./Institute for Civil Justice 1985); Hensler, *supra,* 48 Ohio St.L.J. at 494.

to rely upon the seller had a right to expect that "reputable sellers" would stand behind their goods; and that the burden of accidental injuries caused by such products should be placed "upon those who market them." Restatement (Second) of Torts § 402A comment c (1964).

Arizona adopted the Restatement in 1968. *O.S. Stapley Co. v. Miller*, 103 Ariz. 556, 447 P.2d 248 (1968). The court reaffirmed its commitment to the Restatement in 1972. *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972). The court declared, "Strict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe to those who marketed the product, profit from its sale and have the know-how to remove its defects before placing it in the chain of distribution." *Id.* at 467–68, 501 P.2d at 939–940.

In 1976 Arizona codified the law to a degree by providing a statute of limitations, affirmative defenses, a rule as to indemnification, a rule as to the contents of the complaint, a rule as to evidence, and certain definitions. Ariz.Rev.Stat.Ann. §§ 12–681 to 12–686. "The previously existing common law of products liability" was "modified" only to the extent thus provided. *Id.* at § 12–682. Nothing in the statute changed the rationale for imposing product liability.

Since the adoption of the rule, Arizona has imposed product liability on a variety of actors other than those meeting the precise statutory definition of manufacturer or seller. As is observed by this court, those held liable have included a lessor, a dealer in used goods, a jobber, a distributor and a packager. The common thread has been that each of those held liable has been in the chain of distribution.

In roughly a quarter of a century since section 402A made its appearance, its reach has been extended by many states. We would be a part of that trend were we to hold that Arizona would do so in this instance were this case before one of its courts.

Each state has an incentive to make available to its inhabitants all the possible benefits of section 402A's coverage. To do otherwise is for the state to incur the risk of depriving a potential insured in the state of the coverage for which he or she has paid by reason of the enterprise already having incorporated an insurance premium of this kind in the price of its product.

The question certified by this court assumes that "the precise issue" presented by this appeal has not been decided by an Arizona court. This court arrives at this phrasing of the issue by singling out a single aspect of Goodyear's relation to Goodyear GB—that of trademark licensor. This narrow focus on a single portion of the relationship misses the point of the Arizona doctrine and fails to respond to the rationale of the rule.

The question that should be certified to the Supreme Court of Arizona is: Is a company liable in Arizona under § 402A of the Restatement (Second) of Torts for the tort of a company that it licenses to manufacture in strict accordance with its formulas, specifications and restrictions, using only materials approved by the licensor, with the licensor having the right to inspect the plant and samples produced by the licensee; with the licensor doing all basic product research for the licensed product, with quality control being the responsibility of the licensor; with the licensor warranting the quality of the licensee's product; with the licensor advertising the licensee's product; with the licensor profiting from its charges to the licensee; with the licensor selecting the corporate board of the licensee; with the licensor deciding how much capital will be allocated to the licensee; and with the licensor owning all the common stock of the licensee?

I do not believe the Supreme Court of Arizona is bound to respond mechanically and literally to the question certified to it but may reply as it finds appropriate after setting the question certified within the context of the case in which it arises.