739 P.2d 806

Michael M. MILLER, E.L. "Al" Faber and Faber Brothers Construction Co., an Arizona general partnership, Plaintiffs/Appellants/Cross-Appellees,

v.

MASON–McDUFFIE COMPANY OF SOUTHERN CALIFORNIA, a California corporation, Defendant/Appellee/Cross-Appellant.

No. CV–86–0397–PR.

Supreme Court of Arizona, En Banc.

June 30, 1987.

Kaufman, Apker & Nearhood, P.C. by Robert P. Kaufman, Kathleen M. Pierce, Phoenix, Clair William Lane, Ltd. by Clair W. Lane, Tempe, for plaintiffs/appellants/cross-appellees.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by Andrew D. Hurwitz, Ron Kilgard, Jon M. Sands, Earl, Baird & Williams by Daryl M. Williams, Phoenix, for defendant/appellee/cross-appellant.

MOELLER, Justice.

### I. Jurisdiction

Plaintiff in this case is an Arizona partnership consisting of Michael M. Miller, E.L. Faber, and Faber Brothers Construction Company ("Miller"). Miller brought suit against Mason-McDuffie Company of Southern California ("Mason-McDuffie") to recover damages resulting from the fraudulent acts of Dennis O'Keeffe, an assistant vice president and branch manager of Mason-McDuffie. Miller alleged fraud, breach of contract, and racketeering. The racketeering count was disposed of in favor of Mason-McDuffie by summary judgment. At the conclusion of the trial, Miller elected to submit the case to the jury solely on the fraud theory. Following a jury verdict in favor of Mason-McDuffie, Miller appealed. Division Two of the court of appeals affirmed the judgment, 153 Ariz. 582, 739 P.2d 803, and Miller has petitioned this court to review that opinion. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3); Rule 23, Ariz.R.Civ.App.Proc., 17A A.R.S.

### II. Issues

On appeal, Miller contended that it had been prejudiced by erroneous jury instructions on the issue of apparent authority. The court of appeals disapproved of some of the instructions, but concluded that, taken as a whole, they were adequate. The court of appeals also concluded that, even if the instructions were erroneous, the plaintiff was not prejudiced because there was insufficient evidence to submit the issue of apparent authority to the jury in any event.

We granted review to consider two issues raised by the court of appeals' opinion:

1) Was there sufficient evidence to submit to the jury the question of Mason-McDuffie's liability to Miller for the fraudulent acts of O'Keeffe?

2) If the case was properly submitted to the jury, were the jury instructions on apparent authority proper?

### III. Facts

Many of the basic facts are undisputed. To the extent the facts are disputed, we necessarily must view them in a light most favorable to plaintiff since we are considering whether the evidence was sufficient to submit the issue of apparent authority to the jury. *See Carrel v. Lux*, 101 Ariz. 430, 433, 420 P.2d 564, 567 (1966).

The key figure in this action and the person responsible for the current difficulties between Miller and Mason-McDuffie is Dennis O'Keeffe. Mason-McDuffie is a large national mortgage banking institution with many offices and several subsidiaries. O'Keeffe was an assistant vice president of Mason-McDuffie and was branch manager of its San Diego office. O'Keeffe apparently had two supervisors. One was Steven Mosher, a vice president and regional manager assigned to Mason-McDuffie's main office in northern California. Generally, Mosher called at the San Diego office approximately every two weeks. The record is silent with respect to the activities of the other supervisor. O'Keeffe was provided with an office, company letterhead stationery, business cards, and the other usual accoutrements of his position.

O'Keeffe's duties included the processing of loan applications. He solicited loan ap-

plications from customers and negotiated loan terms with the customers. He submitted completed loan applications to other individuals within the company who would then approve or reject them. He, in turn, communicated the approvals or rejections to the customers. If an application was approved, he continued to work with the customer. If an application was disapproved, he had authority to renegotiate its terms in the event the customer wished to resubmit it in a new form that might be acceptable to Mason-McDuffie. On approved applications, O'Keeffe was authorized to and did receive the commitment fees due from the customers.

It was undisputed that O'Keeffe had authority to do all of the foregoing acts with respect to California customers of Mason-McDuffie. However, at trial, Mason-McDuffie denied that O'Keeffe had similar authority with respect to Arizona customers. Mason-McDuffie's evidence on this point was disputed by Miller. If such a territorial limitation on O'Keeffe's authority existed, it was unknown to Miller and its agents at the time they dealt with O'Keeffe.

In 1980, Miller wanted to finance a 120–unit condominium complex in Tempe, Arizona, called Scene One. A Phoenix bank was willing to provide Scene One's construction financing contingent upon Miller obtaining suitable permanent financing. Thus, Miller needed a loan commitment from a lending institution willing to provide permanent financing to the purchasers of the individual condominium units. To secure such permanent financing, developers pay substantial commitment fees to lending institutions to guarantee that the funds will be available when the units are constructed. The permanent financing commitment was critical to the Scene One project since construction financing was not available until Miller had secured permanent financing.

In the spring of 1981, Michael M. Miller, one of the partners in Miller, heard that Mason-McDuffie might be a source of permanent financing for Scene One. He was told to contact O'Keeffe at Mason-McDuffie's San Diego office. Michael Miller telephoned O'Keeffe in San Diego and explained the situation. During this first conversation, O'Keeffe informed Michael Miller that he, O'Keeffe, could not himself approve loan commitments but that he could submit the applications to a loan committee. After this first telephone conversation, Michael Miller turned the matter over to Miller's mortgage broker, Don Carlos DeSanti. From that point forward, the negotiations were handled principally, if not entirely, between DeSanti and O'Keeffe. These negotiations extended over approximately four months and were conducted by both mail and telephone. During these negotiations, O'Keeffe sent a sample commitment letter to Phoenix for review by Miller and Miller's bank. It was deemed unacceptable to the bank and to Miller. This fact was communicated to O'Keeffe, further negotiations were held, and O'Keeffe submitted a second sample commitment letter which was approved by Miller and the bank.

Around October 2, 1981, O'Keeffe advised DeSanti that a permanent loan commitment in the amount of $1.8 million had been approved. Arrangements were made for O'Keeffe to come to Phoenix and meet with executives of Miller to deliver the commitment and, in exchange, receive the commitment fee. At a meeting at a Phoenix restaurant on October 6, O'Keeffe delivered the $1.8 million loan commitment. In exchange, E.L. Faber, another partner in Miller, wrote a check for $36,000 for the commitment fee. The check was made payable to "Mason-McDuffie" and delivered to O'Keeffe. This check was post-dated to October 12 because the Miller people wanted the opportunity to ensure that the commitment was acceptable to their bank before the check could be negotiated. The bank approved the commitment and construction began.

Unbeknownst to Miller or any of its agents, Mason-McDuffie had, in fact, rejected Miller's application. The loan commitment delivered by O'Keeffe was a phony. The signature on it, which purported to be of "Myrna J. Wilson, vice president," had been forged. The document, while printed on Mason-McDuffie stationery,

stated that the commitment was from "Mason-McDuffie *Investment* Co. of Southern California," rather than from "Mason-McDuffie Company of Southern California." The "Investment Co." was a shell sole proprietorship owned by O'Keeffe and was little more than a checking account. The $36,000 commitment fee payable to "Mason-McDuffie" was later traced through the "Investment Co." account.

The fraudulent loan commitment was apparently part of a sophisticated scam developed by O'Keeffe and applied to Miller's application as well as to others. O'Keeffe would submit loan applications to individuals at Mason-McDuffie authorized to accept or reject them. If rejected, he would sometimes, as here, send a fraudulent loan commitment to the customer. This fraudulent commitment would be on Mason-McDuffie letterhead, but would refer to the fictitious Mason-McDuffie *Investment* Company of Southern California in the body of the commitment. O'Keeffe would then personally pocket the commitment fee by depositing checks made out to Mason-McDuffie in his company's—Mason-McDuffie Investment Co.—bank account. Theoretically, O'Keeffe planned to later cover the fraudulent commitment by quietly arranging for alternate financing through Mason-McDuffie or other sources.

At some point, employees of Mason-McDuffie's Phoenix office learned of the loan commitment and attempted to process financing arrangements for buyers of Scene One condominiums. Eventually, those employees learned that the commitment was fraudulent. Mason-McDuffie so informed Miller and refused to honor the commitment. As a result, construction stopped. Mason-McDuffie told Miller it would attempt to make a different commitment, but nothing satisfactory was ever worked out between the parties. Eventually, Miller arranged for financing from other sources. Scene One was finally completed in late 1983. Contending that it had been damaged by the fraudulent acts of Mason-McDuffie's agent O'Keeffe, Miller brought this suit against Mason-McDuffie.

## IV. Sufficiency of the Evidence
### A. Apparent Authority

The court of appeals stated, "[I]t is clear from the record that Miller was unable to produce any evidence of conduct on the part of Mason-McDuffie which would support a finding of apparent authority." *Miller v. Mason-McDuffie Company of Southern California*, 153 Ariz. 582, 585, 739 P.2d 803, 806 (App.1986). We disagree.

■ The touchstone of apparent authority is conduct of a principal that allows a third party reasonably to conclude that an agent is authorized to make certain representations or act in a particular way. It is firmly established that if the principal's conduct creates apparent authority, the principal is subject to liability for the agent's actions even if the agent was acting for his own purposes. *See Gulf Ins. Co. v. Grisham*, 126 Ariz. 123, 126, 613 P.2d 283, 286 (1980) ("the ostensible agent is one where the principal has intentionally or inadvertently induced third persons to believe that such a person was its agent although no actual or express authority was conferred"), *quoting Canyon State Canners v. Hooks*, 74 Ariz. 70, 73, 243 P.2d 1023, 1025 (1952).

In our opinion, the Arizona case of *Gibraltar Escrow Co. v. Thomas J. Grosso Inv.*, 4 Ariz.App. 490, 421 P.2d 923 (1966), strongly supports plaintiff's position here. In *Gibraltar*, Don Smith was the general manager and operations officer of the Gibraltar Escrow Company. Gibraltar had been created for the primary purpose of handling the financing and escrowing of John F. Long homes. Smith was in complete charge of the Gibraltar office, subject only to control by Long executives, who were located in Long's main offices at a different location. Smith set up fictitious escrows, and a third party lender made loans with the fictitious escrows as security. When the scheme was discovered, the lender sued Gibraltar contending that it was responsible in damages for the fraud of its agent Smith. There was, of course, no actual authority from Gibraltar to Smith authorizing him to do what he did, so plain-

tiff had to rely upon apparent authority. After reviewing the applicable Arizona cases and, in particular, §§ 257, 262, and 271 of the Restatement of the Law of Agency (Second), the court agreed with plaintiff that, as a matter of law, Gibraltar was liable. It therefore affirmed a summary judgment which had been granted to plaintiff on a theory of apparent authority.

The Restatement sections relied upon by the court in *Gibraltar* are as follows:

**§ 257. Misrepresentations; in General.**
A principal is subject to liability for loss caused to another by other's reliance upon a tortious representation of a servant or other agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal.

**§ 262. Agent Acts for His Own Purposes.**
A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this.

**§ 271. Notification; Agent's Interests Adverse to Principal's.**
A notification by or to a third person to or by an agent is not prevented from being notice to or by the principal because of the fact that the agent, when receiving or giving the notification, is acting adversely to the principal, unless the third person has notice of the agent's adverse purposes.

The facts in the instant case are strikingly similar to those in *Gibraltar* and fall within the Restatement sections relied upon by the court in *Gibraltar*. We cannot accept the court of appeals' conclusion that *Gibraltar* should be disregarded because it was decided on summary judgment (for plaintiff) and because it did not involve jury instructions.

■ Mason-McDuffie was in the business of lending money. It hired O'Keeffe, made him an assistant vice president and placed him in charge of its San Diego office. It provided him with business cards, letterhead stationery, and an office. It entrusted him with authority to represent it in dealings with customers relative to loans of the type here involved. He was authorized to and did negotiate with customers on the terms and conditions of their loan applications. He advised customers of the approval of their loan applications, and received commitment fees from them on behalf of Mason-McDuffie. O'Keeffe had actual authority to transmit loan commitments to customers and to receive commitment fees from them. That is exactly what he purported to do in this case. A jury could find that he had apparent authority to represent that the loan commitment on the Arizona project was legitimate.

### B. Reasonable Reliance

■ In order to hold a principal liable for an agent's acts on a theory of apparent authority, the third party must show that his reliance upon the agent's apparent authority was reasonable. *See, e.g., Lois Grunow Memorial Clinic v. Davis*, 49 Ariz. 277, 284, 66 P.2d 238, 241–42 (1937) (person dealing with agent must exercise "due caution" in ascertaining scope of agent's authority); *Shelby v. Zayre Corp.*, 474 So.2d 1069, 1071 (Ala.1985) (department store not liable to employee for alleged false statement made by assistant manager where employee's reliance on false statement not justifiable); *O'Malley v. Putnam Safe Deposit Vaults, Inc.*, 17 Mass.App. 332, 337, 458 N.E.2d 752, 757 (1983) (irregular actions of employee not reasonably necessary to authorized duties not within employee's apparent authority). If, under the circumstances, Miller had no right to rely on O'Keeffe's apparent authority, Mason-McDuffie is not liable.

■ Mason-McDuffie contends that, as a matter of law, Miller was not entitled to rely upon O'Keeffe's apparent authority. Mason-McDuffie claims that irregularities in the loan commitment document were "red flags" that should have alerted Miller to the forgery. Mason-McDuffie points to the fact that the loan commitment contained a number of typographical errors. Also, the formula for determining the interest rate in the loan commitment was de-

pendent upon a non-existent Federal Home Loan Mortgage Corporation auction. Miller's mortgage broker admitted that he did not fully understand all the terms used in the interest rate clause. Mason-McDuffie also makes much of the fact that the body of the loan commitment refers to "Mason-McDuffie *Investment* Co. of Southern California" instead of "Mason-McDuffie Company of Southern California." However, the evidence also shows that Mason-McDuffie did business through several similarly-named subsidiaries. Indeed, one of its own former executives testified that he assumed "Mason-McDuffie *Investment* Co. of Southern California" was one of Mason-McDuffie's subsidiaries.

Another alleged "red flag" arose during negotiations for the Scene One loan commitment when DeSanti and O'Keeffe discussed financing for a proposed Las Vegas casino. O'Keeffe told DeSanti that Mason-McDuffie would not be involved in the casino deal and requested an agreement providing that any commissions from it be paid to O'Keeffe's wife. DeSanti testified that O'Keeffe's request disturbed him but he continued his negotiations and nothing further came of the Las Vegas deal.

The evidence presented at trial does not necessarily show that Miller's reliance was unreasonable. The loan commitment's alleged irregularities went unnoticed by experienced bank officers. The bank required the loan commitment and the bank's reliance on O'Keeffe's forged loan commitment is certainly evidence that Miller's reliance was reasonable. Having examined the exhibits, we are unprepared to say, as a matter of law, that Miller had no right to rely on them. The evidence, at most, raises a factual dispute concerning Miller's right to rely. The trial court correctly determined that the question of the reasonableness of the reliance was a jury question.

## V. Jury Instructions

Miller contends that the trial court erroneously instructed the jury on the theory of apparent authority.

Specifically, Miller objects to the following three jury instructions:

An employer is subject to liability for loss caused to another by the other's reliance upon the tortious or fraudulent representations of an employee only if you find that the representation is: (a) authorized; (b) apparently authorized; or (c) was within the power of the employee to make for the employer.

In this case, there is no evidence that Dennis O'Keeffe had express authority, or that the contract was within his power to finalize on behalf of the defendant employer. The only issue before you is whether or not Dennis O'Keeffe acted with apparent authority *and in concert with his employer,* the Mason-McDuffie Co. of Southern California.

(Emphasis added.)

Before a corporation can be liable for the fraud of one of its employees the plaintiff must show that there was *a concert of action between the employee and the corporation.* That is, the corporation must have worked with the employee to defraud the victim.

(Emphasis added.)

It is not enough to show Dennis J. O'Keeffe made false and fraudulent representations to the plaintiffs. The *requirement that there be a concert of action* means that Mason-McDuffie Co. of Southern California must have been either working actively with O'Keeffe or must have had a knowledge or reasonable ground for believing that O'Keeffe was doing what he was doing and that the plaintiffs were relying thereon and changing their position for the worse.

(Emphasis added.)

Miller argues that these instructions are erroneous in requiring concert of action before Mason-McDuffie can be found liable. We agree.

■ Imposition of employer liability under principles of apparent authority does not require a finding of concert of action between the employer and employee. Nor does it require knowledge by the employer that the employee is committing a fraud. To the contrary, the employee's apparent authority is completely independent of the

employer's participation in or knowledge of the employee's fraudulent representations. *See Nason v. Voight,* 128 Ariz. 385, 625 P.2d 974 (App.1981); Restatement (Second) of Agency § 261, comment a (principal subject to liability for apparently authorized agent's fraud "although he is entirely innocent, has received no benefit from the transaction and ... although the agent acted solely for his own purposes"); *id.* at § 262 (liability not eliminated simply because agent acts for own purposes).

Throughout this litigation, Mason-McDuffie has contended that a principal may not be subjected to tort liability for a fraudulent transaction on a theory of apparent authority. As the Restatement and the other authorities in this opinion make clear, Mason-McDuffie's contention is without merit. However, the contention appears to have been at least partially successful in the trial court and to have led to the erroneous "concert of action instructions."

We further note that the "concert of action" phrase in the instructions was drawn from *Leigh v. Swartz,* 74 Ariz. 108, 245 P.2d 262 (1952). *Leigh* was not an apparent authority case. The question in *Leigh* was whether a principal had *actually* authorized his agent to make fraudulent representations in a real estate transaction. The principal had allegedly told the agent "to go ahead and handle it any way I [the principal] saw fit." *Id.* at 116, 245 P.2d at 267. The court held that the statement did not relate to the transaction under consideration but that, even if it did, such a broad delegation did not justify "an assumption that the agent is thereby at liberty to make false and fraudulent representations to a prospective purchaser. For the principal to be bound there must be a *concert of action* which is not shown in the instant case." The phrase "concert of action" was clearly just the *Leigh* court's description of the type of action needed to create actual authority in an agent.

Concert of action is clearly not necessary to create apparent authority. In the context of this case, the requirement of concert of action is antithetical to the concept of liability based on apparent authority. If there had been concert of action, O'Keeffe would have had actual authority to defraud Miller and Mason-McDuffie would be liable as a participating defrauder. The instructions were erroneous.

■ The court of appeals, while disapproving of the concert of action instructions, felt that the instructions as a whole were "sufficient to apprise the jury of the proper rules it was to apply." *Miller,* 153 Ariz. at 585, 739 P.2d at 806. We disagree.

The following instruction, for example, ordered the jury to disregard some of the evidence that could properly form the basis for a finding of apparent authority:

In determining the responsibility of Mason-McDuffie Co. of Southern California for Dennis O'Keeffe's conduct, you must disregard any statements made by Dennis J. O'Keeffe. The mere fact that O'Keeffe was a branch manager, assistant vice-president, used Mason-McDuffie Co. of Southern California letterhead, had an office at Mason-McDuffie Co. of Southern California, received phone calls at Mason-McDuffie Co. of Southern California, said he was acting on behalf of Mason-McDuffie Co. of Southern California or used a business card, does not make his acts or declarations those of Mason-McDuffie Co. of Southern California and does not make Mason-McDuffie Co. of Southern California responsible for Dennis O'Keeffe's fraudulent activities or establish grounds for believing that O'Keeffe was engaged in fraudulent activities.

The instruction goes too far. While an agent cannot, by his own words or conduct, create apparent authority, the instruction improperly blends O'Keeffe's statements and actions with Mason-McDuffie statements and actions and instructs the jury to disregard both. *See Bank of Am. v. Barnett,* 87 Ariz. 96, 100, 348 P.2d 296, 299 (1960), *citing United States Smelting, Ref. and Mining Exploration Co. v. Wallapai Mining and Dev. Co.,* 27 Ariz. 126, 130, 230 P. 1109, 1110 (1924). Further, the instruction suggests that Mason-McDuffie had to know or believe that O'Keeffe was engaged in fraudulent activities. As we have discussed, an employer's knowledge is

not a required element under apparent authority principles.

■ Furthermore, we believe the record demonstrates conclusively that the erroneous "concert of action instructions" were not neutralized by other instructions. The jury sent the following question to the trial court during their deliberations: "[W]hen the law states 'concert of action,' is this pertaining directly to the actual concert of action regarding fraud or concert of action regarding O'Keeffe's actions in general?" The trial judge responded as follows: "[W]hen you consider the concert of action, it is pertaining to the fraud that is alleged in the case and not to the entire conduct of Dennis O'Keeffe in general." Within minutes, the jury returned a defense verdict.

We conclude that the concert of action instructions were erroneous and were not saved by the balance of the instructions.

### VI. Conclusion

Since the court of appeals affirmed the defense verdict, it did not reach the damage issues raised by the cross-appeal. While we remand for a new trial, we also do not reach those issues (there was no cross-petition for review) since those damage issues may well be different at a retrial.

Miller is entitled to a new trial at which a jury may determine Mason-McDuffie's liability, if any, under instructions which properly state the law of apparent authority. The opinion of the court of appeals is vacated, as is the trial court's judgment in favor of Mason-McDuffie (including attorneys' fees). Claims of attorneys' fees on appeal may be heard and determined by the trial court when a prevailing party has been determined. This case is remanded for proceedings consistent with this opinion.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.