773 P.2d 1022

**ANCHOR EQUITIES, LTD., a New York corporation, Plaintiff–Appellee,**

v.

**Tristan JOYA, Jr. and Jane Doe Joya, husband and wife, Defendants–Appellants.**

**No. 1 CA–CV 88–117.**

Court of Appeals of Arizona, Division 1, Department D.

March 2, 1989.

Review Denied June 20, 1989.

Atmore L. Baggot, Phoenix, for defendants-appellants.

Gammage & Burnham by Richard K. Mahrle, Gregory G. Schultz, Phoenix, for plaintiff-appellee.

## OPINION

KLEINSCHMIDT, Judge.

This is an appeal from the denial of a motion for new trial following a judgment in favor of the appellee, Anchor Equities, Ltd., for damages it suffered as a result of a fraudulent scheme perpetrated by appellant Tristan Joya and other defendants. We consider the following issues:

1) whether a person who has joined an agent in defrauding his principal can avoid liability to the principal on the ground that the agent's knowledge of the fraud was imputable to the principal;

2) whether a person who has joined an agent in defrauding his principal can avoid liability to the principal on the ground that he relied upon the agent's apparent authority to perpetrate the fraud; and

3) whether knowledge of the results of an agent's investigation into the facts upon which a representation is based is imputable to a principal when the investigation was performed by an agent acting adversely to the principal's interests.

We find that a party who has joined an agent in defrauding his principal cannot escape liability to the principal on any of the grounds advanced. We also find that knowledge of the results of an investigation performed by an agent acting adversely to his principal's interests is not imputable to the principal so as to benefit a third party acting in concert with the agent. Finally, we find that the appellant has waived the remaining arguments that he raised in his brief, and we affirm the denial of the motion for new trial.

Anchor is a mortgage banking firm. Its business involves putting together packages of loans that are eventually sold to federal loan entities. In accordance with the requirements of these entities, Anchor

requires that each borrower make a twenty percent down payment and that the source of the down payment be the borrower's own savings.

One of the defendants, Bryan Bruno, was a loan officer with Anchor. His duties included preparing loan applications, obtaining verifications from various banks that the applicants had the required down payment amount in their accounts, and facilitating Anchor's processing of the loans. The trial judge found that Bruno, with the help of Joya and other defendants, deposited funds into the accounts of certain loan applicants until bank verifications of their account balances were obtained. The funds were then withdrawn, and Bruno submitted loan applications to Anchor which falsely represented that the applicants had the required down payment amount in their accounts.

The trial judge found that Bruno's purpose in submitting the falsified applications was to defraud his employer, Anchor. He also found that no one else at Anchor was aware that the applications had been falsified and that Anchor would not have made the loans if it had known that the applicants did not meet the federal requirements.

Joya was a director, officer, and part-owner of the corporation that built the homes for which the falsified mortgage loan applications were being submitted. When the applicants filled out the loan applications, they were told that they were investing in the homes, but that they would never be required to put any of their own money into them. A corporation affiliated with Joya's was to make the down payments, rent the homes, and apply the rent proceeds to the mortgage installments.

On behalf of his corporation, Joya executed an affidavit of purchaser and vendor, escrow instructions, and an escrow settlement statement for each loan. These documents represented that the corporation had received or would receive the required down payment from the applicant. The trial judge found that at all relevant times, Joya knew that the applicants would never make the down payments.

Anchor relied upon the falsified applications and documents in making eighteen loans. Bruno received a commission of $13,200 on all but two of the loans. Joya's corporation received the bulk of the loan proceeds. When each of the loans went into default within a very short time, Anchor was required to indemnify the federal entities that had bought the loans from the ensuing losses.

The trial judge found that all of the defendants, including Joya, made representations to Anchor that they knew were false. He further found that the defendants acted pursuant to a fraudulent scheme or artifice within the meaning of the racketeering statutes to induce Anchor to make the loans in question. *See* A.R.S. § 13–2310 (Supp.1988). He therefore ruled that the defendants were jointly and severally liable for Anchor's damages and that Anchor was entitled to have the damages trebled pursuant to A.R.S. § 13–2314(A) (Supp.1988).

Joya's counsel filed a motion for new trial. At the hearing on the motion, Joya requested that his counsel be relieved as attorney of record. The trial judge granted this request. The day before the hearing, Joya filed an amended motion for new trial *in propria persona*. The trial judge considered and denied both the motion and the amended motion for new trial. Joya appeals from this denial.

Joya first argues that by giving Bruno the express authority to originate loans and to verify the account balances of applicants, Anchor gave Bruno the apparent authority to complete the applications in the manner that he did. He contends that he relied upon Bruno's representations that there was nothing wrong with submitting false down payment information and that Anchor cannot recover from him because it apparently authorized Bruno to make such representations. He further argues that Anchor cannot recover from him because under these circumstances, Bruno's knowledge of the fraudulent nature of the applications is imputable to Anchor. Joya's arguments are bold ones, but they are flawed.

An agent's knowledge is not imputable to his principal when the agent acts adversely to his principal's interests. *Hays v. Bank of Arizona,* 57 Ariz. 8, 11, 110 P.2d 235, 237 (1941). The trial judge found that Bruno submitted the falsified applications to defraud Anchor. Since we have not been provided with a transcript of the trial, we presume that the evidence supported the trial judge's finding. *Rapp v. Olivo,* 149 Ariz. 325, 330, 718 P.2d 489, 494 (App.1986).

We reject Joya's argument that because Anchor received benefits in the form of commissions from the loans in question, it cannot now disavow the defendants' actions. In *United States v. Ridglea State Bank,* 357 F.2d 495 (5th Cir.1966), Jack Hubbard submitted fraudulent loan applications for approval in the course of his employment as a loan officer for two different banks. The loans were insured by the Federal Housing Authority (FHA), and the banks filed claims with the FHA for reimbursement of the losses that they suffered when the loans went into default. The government subsequently sued the banks under the False Claims Act. In discussing whether Hubbard's knowledge that the applications were falsified should be imputed to his employer banks for the purpose of establishing their civil liability under the False Claims Act, the court of appeals stated as follows:

> In the present case, Hubbard's purpose was most certainly not to benefit his employer banks. He must have known that the loans he approved would be defaulted, so that the banks would not make any money on interest on the loans. And, as the trial court found, Hubbard's approval of fraudulent applications for FHA-insured loans endangered the banks' ability to continue to handle FHA business and jeopardized the reputation of the banks and their financial integrity.

*Id.* at 498.

The same reasoning is applicable here. Since Bruno was clearly acting adversely to Anchor's interests in misrepresenting the financial strength of the loan applicants, his knowledge of the misrepresentations cannot be imputed to Anchor.

Although the knowledge of an agent who is acting adversely to his principal will not be imputed to the principal, the principal may still be liable under apparent authority principles for damages that an agent's adverse actions cause third parties. In *Miller v. Mason–McDuffie Co.,* 153 Ariz. 585, 739 P.2d 806 (1987), the court explained as follows:

> Imposition of employer liability under principles of apparent authority does not require a finding of concert of action between the employer and employee. Nor does it require knowledge by the employer that the employee is committing a fraud. To the contrary, the employee's apparent authority is completely independent of the employer's participation in or knowledge of the employee's fraudulent representations.

*Id.* at 591–92, 739 P.2d at 812–13.

Apparent authority is created when the principal's conduct leads a third party to reasonably believe that he has authorized his agent to take the actions or make the representations in question. *Id.* at 589, 739 P.2d at 810. One of the policies underlying the doctrine is that between two innocent parties—the principal and the third party injured by relying upon the agent's apparent authority—the principal should bear the loss because his actions made it possible. *Asphalt Indus. v. Commissioner of Internal Revenue,* 384 F.2d 229, 234 (3d Cir.1967). This policy was recognized in *Brutinel v. Nygren,* 17 Ariz. 491, 154 P. 1042 (1916), where the court stated as follows:

> So far as the authority of an agent involves the rights of innocent third persons, who have relied upon the character bestowed upon the agent, the principal is bound equally by the authority which he actually gives and by that which by his own act he appears to give. . . .

*Id.* at 498, 154 P. at 1045.

Joya's apparent authority argument fails on two grounds. In the first place, Joya has not identified any conduct on An-

chor's part that led him to believe that it had given Bruno the apparent authority to accept or submit fraudulent loan applications.

■ Secondly, in order to hold a principal liable for his agent's acts under an apparent authority theory, the third party must demonstrate that his reliance upon the agent's apparent authority was reasonable. *Miller*, 153 Ariz. at 590, 739 P.2d at 811. The trial judge found that Joya was fully aware of the fraudulent nature of the scheme and that he nevertheless participated in it. However, even if Joya had been unaware of the fraudulent nature of the undertaking as a whole, he could not demonstrate that he reasonably relied upon Bruno's apparent authority when he submitted documents containing representations that he himself knew were false.

■ Joya next argues that where a party to whom a representation has been made conducts his own investigation into the facts upon which the representation is based, he cannot later maintain an action for fraud on the ground that he was misled by the representation. He claims that Anchor cannot maintain an action for fraud because it conducted its own investigation into the financial status of the loan applicants through its agent, Bruno. He further claims that since it cannot maintain an action for fraud, Anchor did not sustain an injury by racketeering as defined by A.R.S. § 13–2314(A). He contends that the superior court therefore lacked jurisdiction to enter an award of treble damages pursuant to that statute.

This argument is based upon the same faulty premise as Joya's contention that Bruno's knowledge of the fraud is imputable to Anchor. Since Bruno was acting adversely to Anchor's interests when he "investigated" the financial status of the loan applicants, the rule that Joya relies on simply does not apply. *See First Nat'l Bank v. Dean Witter & Co.*, 84 Nev. 303, 307, 440 P.2d 391, 394 (1968) (principal will not be charged with agent's knowledge where knowledge is adverse to principal and naturally would not be communicated to it).

Finally, Joya argues that Arizona's racketeering statutes are unconstitutional because they allow the state to punish crime without requiring it to prove the defendant's guilt beyond a reasonable doubt. He also asserts that the statutes are unconstitutional because they allow the state to punish fraud without requiring it to prove the existence of fraud by clear and convincing evidence. These arguments were not raised in the trial court. In our discretion, we decline to entertain them. *See Glick v. Town of Gilbert*, 123 Ariz. 395, 399, 599 P.2d 848, 852 (App.1979).

For the foregoing reasons, we affirm the trial court's denial of Joya's motion for new trial.

GRANT, C.J., and FIDEL, J., concur.