**UNIVERSAL PREMIUM ACCEPTANCE CORPORATION, Plaintiff,**

v.

**PREFERRED NATIONAL INSURANCE COMPANY, Defendant.**

**No. CIV. A. 98–2464–GTV.**

United States District Court, D. Kansas.

Aug. 24, 2001.

---

Kent E. Whittaker, Cheryl Bloethe Linder, Morrison & Hecker L.L.P., Kansas City, MO, Joan K. Rowland, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for plaintiff.

David R. Buchanan, Angela K. Hatley, Brown & James, P.C., Kansas City, MO, Derek H. Potts, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

Plaintiff filed this diversity action against defendant alleging that defendant failed to return unearned premiums due under multiple insurance policies, and/or that defendant is liable for damages caused by the misrepresentations of its agent. The case was tried to the court on January 11, 2000. After carefully considering the testimony of the witnesses, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### I. Findings of Fact

1. Plaintiff Universal Premium Acceptance Corporation ("Universal Premium") is a Missouri corporation with its principal place of business in Kansas.

2. Universal Premium operates as a premium finance company, loaning money to insureds for the payment of insurance premiums. Accordingly, Universal Premium advances premiums on behalf of insureds, who repay with interest over time.

3. Incidental to each loan, Universal Premium enters into a "premium finance agreement," whereby it acquires the insured's right to cancel the underlying policy if the insured defaults on required payments. Upon exercising the right, Universal Premium is entitled to receive all unearned premiums due under the policy from the insurer.

4. Defendant Preferred National Insurance Company ("Preferred National")

is a Florida corporation with its principal place of business in Florida.

5. Preferred National operates as an insurance company.

6. On January 1, 1992, Preferred National appointed Wycon Corporation ("Wycon") as its Underwriting Manager. In doing so, Preferred National authorized Wycon to bind coverage and issue policies on its behalf, and to "solicit business through ... licensed independent insurance agents ... [and] exercise its own judgment as to the persons whom it will solicit and the time and place of solicitation." (Agency Agreement between Preferred National and Wycon entered into on January 1, 1992.)

7. Wycon, as the agent of Preferred National, entered into a written agency agreement with Transportation & Specialty Marketplace Agency ("TSMA"), an insurance agency located in Phoenix, Arizona.[1] The agreement authorized TSMA to solicit business and bind coverage on behalf of Preferred National. The agreement also authorized TSMA to collect, receive, and give receipts for premiums on business that it placed with Preferred National.[2]

8. Wycon provided TSMA with Preferred National insurance application forms.

9. Universal Premium began doing business with TSMA in August of 1996. Prior to doing business, Universal Premium verified that TSMA was in fact the general agent of Wycon/Preferred National, and that TSMA was authorized to bind insurance and collect premiums on behalf of Preferred National.

10. Universal Premium granted TSMA authority to issue Universal Premium drafts to itself or to Preferred National. Such drafts were subject to approval by Universal Premium: Universal Premium's bank would notify Universal Premium each time a draft was written by TSMA, and then allow Universal Premium twenty-four to forty-eight hours to reject the draft prior to payment.

11. Universal Premium provided TSMA with standardized premium finance agreement forms. TSMA often assisted insureds in filling out the finance agreement forms.

12. Each premium finance agreement required the signature of the insured. In addition, each premium finance agreement contained an "Agent Certification" section to be signed by a representative of TSMA. That section stated the following:

> The undersigned agent hereby certifies that all policies listed above have been issued and delivered, and that the down payment as shown in the contract has been paid by or on behalf of the Insured, and that all policies listed herein were issued by this agency. The undersigned warrants that the above contract evidences a bona fide and legal transaction; that the Insured is of legal age and has capacity to contract, that the signature

1. In September of 1997, Transportation & Specialty Marketplace Agency, Inc. changed its name to Arizona Underwriters Insurance. The court refers to both Transportation & Specialty Marketplace Agency, Inc. and Arizona Underwriters Insurance as "TSMA."

2. TSMA's binding authority was somewhat limited: while TSMA was authorized to bind policies covering a broad range of topics and persons (including restaurants and taverns, food vendors, artisan contractors, special events, homeowners, general contractors, and commercial vehicle physical damage), TSMA was not authorized to bind policies covering professional liability, monoline/vacant property, and/or marine and boat dealers. (Agency Agreement between Wycon and TSMA entered into on August 15, 1996; Wycon Corporation General Procedural Guidelines.)

is genuine and that he has delivered a copy of this contract to the Insured. Upon termination of this Agreement or cancellation of any scheduled policies the undersigned agrees to pay the unearned premiums and unearned commissions to [Universal Premium].

13. TSMA forwarded the completed agreements to Universal Premium for acceptance.

14. Each time Universal Premium accepted an agreement, it sent a "Notice of Premium Financing" to Preferred National, requesting positive confirmation of the terms of the underlying policy. The notices included the following language:

> Instructions: Please examine this notice of premium financing carefully and either confirm its correctness or report any differences. Your prompt attention to this request will be appreciated.
>
> [ ] I confirm all data for these policies are correct.
>
> [ ] I have made necessary changes to your data.

15. Preferred National never responded to Universal Premium's notices.

16. Between December of 1996 and November of 1997, TSMA sent Universal Premium eighty-four fraudulent premium finance agreements. Each agreement contained the signature of an alleged insured, as well as the signature of a representative of TSMA following the "Agent Certification" section.

17. The eighty-four premium finance agreements were prepared entirely by TSMA, and involved fictitious insureds to whom no insurance policies were issued.

18. Based upon TSMA's representations in the "Agent Certification" section, Universal Premium accepted the agreements. In relation thereto, Universal Pre-

mium authorized payment on eighty-four drafts prepared by TSMA and made payable to TSMA or S.M.A., a company affiliated with TSMA.

19. TSMA retained all monies from the drafts.

20. Universal Premium sent Preferred National a Notice of Premium Financing with respect to each of the fraudulent premium finance agreements. Each notice requested that Preferred National confirm the terms of the underlying policies.

21. In accordance with its usual practice, Preferred National did not respond to any of the notices.

22. When the insureds failed to make payments required by the premium finance agreements, Universal Premium attempted to exercise its right to cancel the underlying policies and to collect from Preferred National the unearned premiums.

23. Preferred National refused to pay any funds to Universal Premium.

24. As a result of TSMA's fraudulent behavior, Universal Premium suffered damages in the amount of $375,293.26.

## II. Conclusions of Law

### Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, and the plaintiff and defendant are citizens of different States. The court has personal jurisdiction over the defendant. Venue is proper in the District of Kansas pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events giving rise to the claims occurred in Kansas.

### Arizona Revised Statute § 6–1416 (Count I) [3]

■ Universal Premium alleges that Arizona Revised Statute § 6–1416 requires

---

**3.** The parties stipulate and the court agrees that Arizona law applies to the claims in this

Preferred National to return all unearned premiums that it paid to TSMA in accordance with the eighty-four premium finance agreements. Assuming that § 6–1416 creates a private right of action in favor of a premium finance company against an insurer for the return of unearned premiums, the court concludes that § 6–1416 entitles Universal Premium to no relief.

Section 6–1416 provides in relevant part:

If a financed insurance policy is canceled by any party, the insurer shall return the gross unearned premiums due under the insurance policy directly to the premium finance company for the account of the insured as soon as reasonably possible....

For § 6–1416 to apply, an insurance policy must be issued or at least bound by the insurance company. Here, the eighty-four premium finance agreements represented that insurance policies had been issued by Preferred National, but such representations were false. The policies referenced in the agreements were entirely fictional.[4] Because the policies were neither issued nor bound, § 6–1416 does not apply.

### Equitable Estoppel (Count IV)

■ Universal Premium argues that Preferred National should be equitably estopped from denying the existence of the policies underlying the eighty-four premium finance agreements, because it failed to respond to any of its notices of premium financing. The court disagrees.

■ "The doctrine of equitable estoppel applies when the conduct of a party absolutely precludes the party from asserting rights which might have otherwise existed against another person who in good faith has relied upon the conduct and as a result of such reliance has changed his position for the worse." See *Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 730 P.2d 235, 237 (1986). The doctrine arises when the acts or representations of one induce another to believe that certain facts exist, and the other acts upon such facts. See *id.* at 238. The essential elements of equitable estoppel include (1) conduct by which one induces another to believe in certain material facts; (2) inducement which results in acts in justifiable reliance thereon; and (3) resulting acts which cause injury. See *id.*

Universal Premium sent a notice of premium financing to Preferred National each time it accepted a premium finance agreement from TSMA. Each one of these notices requested *positive confirmation* from Preferred National that the terms of the policy underlying the referenced agreement were correct. Preferred National never responded to a single notice. As Universal Premium states, such was the nature of the "course of dealing between the parties." (Plaintiff's Post Trial Brief at 11.) While Preferred National's lack of response may have induced Universal Pre-

---

case.

4. Universal Premium argues that at least eight of the eighty-four policies were issued as evidenced by Plaintiff's Exhibit 12, the accounting records of Preferred National. The accounting records show that eight policies were issued to the names of insureds that Universal Premium purported to finance, and that the policies issued to those insureds carried the exact dates of issuance and expiration as those referenced in the premium fi-

nance agreements. The court has examined the accounting records, and determines that they do not lend themselves to a finding that eight of the policies underlying the agreements were actually issued. While the names and dates are the same, the premium amounts are entirely different. It is possible that TSMA prepared the fraudulent agreements by mimicking in part policies that were actually issued by Preferred National.

mium to believe that the policies underlying its agreements were valid, the court finds Universal Premium's reliance to be unreasonable.

Misrepresentation (Counts II and III)

■ In each of the eighty-four premium finance agreements, TSMA falsely represented that all policies listed in the finance agreement had been issued; that the down payment as shown in the finance agreement had been paid by or on behalf of the insured; that the insured, being of legal age and capacity to contract, had signed the finance agreement; and that all unearned premiums would be returned to Universal Premium upon termination of the finance agreement or cancellation of the listed policies. Based upon such representations, Universal Premium accepted the eighty-four premium finance agreements and made substantial payments on behalf of the insureds to TSMA. Universal Premium contends that Preferred National should be held liable for the damages it sustained as a result of TSMA's misrepresentations. The court agrees.

■ A principal will be held liable " 'for loss caused to another by the other's reliance upon a tortious representation of [the principal's] servant or other agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal.' " *Miller v. Mason McDuffie Co.* of S. Cal., 153 Ariz. 585, 739 P.2d 806, 811 (1987) (quoting Restatement (Second) of Agency § 257).

■ Preferred National granted TSMA express actual authority to engage in the sale of insurance (including the authority to solicit business, bind coverage, and collect/receive premiums). In doing so, Preferred National granted TSMA implied ac-

tual authority to engage in all acts that are so similar to or incidental to the sale of insurance. See *State v. Heinze*, 196 Ariz. 126, 993 P.2d 1090, 1093 (Ct.App. 1999) (citing *Arizona v. Schallock*, 189 Ariz. 250, 941 P.2d 1275, 1282 (1997) (citing Restatement (Second) of Agency § 229(1))). As the Massachusetts Court of Appeals stated under similar circumstances, the court has "no difficulty in classifying an insurance agent's arranging for premium financing as being within the scope of that broad authority." *New England Acceptance Corp. v. Am. Mfrs. Mut. Ins. Co.*, 4 Mass.App.Ct. 172, 344 N.E.2d 208, 212 (1976); *contra Std. Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 656 N.Y.S.2d 188, 678 N.E.2d 874, 875 (1997) (rejecting contention that premium financing is an activity incidental to or reasonably necessary for the performance of selling insurance policies). The undisputed evidence shows that premium financing is commonly employed as a means of effecting sales of insurance policies. Moreover, insurance agencies such as TSMA routinely assist insureds in obtaining premium financing by making representations similar to those that were made in this case. Kenneth Sutter, former Vice President of Administration of Wycon, testified through deposition offered at trial that it was common for insurance policies written by Preferred National to be financed by premium finance companies. Similarly, Scott Weicholz, Treasurer of Preferred National, testified through deposition offered at trial that "it's typical for an agent to provide [a] financing mechanism for policies written by insurance companies." The court determines that Preferred National granted TSMA implied actual authority to assist insureds in obtaining legitimate premium financing and thereby to make truthful representations in premium finance agree-

ments on its behalf.[5]

■ Because TSMA possessed authority from Preferred National to make truthful representations in premium finance agreements, the court determines that TSMA possessed apparent authority to make the false representations contained in the eighty-four premium finance agreements at issue in this case. See *Anchor Equities, Ltd. v. Joya*, 160 Ariz. 463, 773 P.2d 1022, 1025 (Ct.App.1989) (stating that apparent authority "is created when the principal's conduct leads a third party to reasonably believe that he has authorized his agent to take the actions or make the representations in question") (citing *Miller*, 739 P.2d at 810); see also *Miller*, 739 P.2d at 811 (holding that a jury could find defendant's agent apparently authorized to represent that fraudulent loan commitment was legitimate where defendant's agent had actual authority to advise customers of the approval of loan applications).

■ In addition, the court determines that Universal Premium reasonably relied upon TSMA's apparent authority to make the false representations contained in the eighty-four premium finance agreements. See *Miller*, 739 P.2d at 811 ("In order to hold a principal liable for an agent's acts on a theory of apparent authority, the third party must show that his reliance upon the agent's apparent authority was reasonable.") (citations omitted). Prior to doing business with TSMA, Universal Premium verified that TSMA was in fact the general agent of Wycon/Preferred National, and that TSMA was authorized to bind insurance and collect premiums on behalf of Preferred National. Thereafter, Universal Premium was given no reason to believe that it should inquire further as to TSMA's authority to make the representations contained in the eighty-four premium finance agreements.[6]

Having put TSMA in a position to commit fraud while apparently acting on its behalf, the court holds Preferred National liable for the damages caused to Universal Premium. The evidence indicates that Universal Premium suffered damages in the total amount of $375,293.26. See Plaintiff's Exhibit 14 (setting forth the amount owing on each individual finance agreement at the time of cancellation). The court awards Universal Premium damages in the amount of $375,293.26 plus prejudgment interest at a rate of ten percent per annum. To lessen the burden of the court in calculating the appropriate amount of prejudgment interest, the court directs Universal Premium to submit within ten (10) days a detailed chart (similar to

5. If TSMA did not have implied actual authority to assist insureds in obtaining legitimate premium financing and thereby to make truthful representations on behalf of Preferred National, TSMA at least had apparent authority to do so. See *Anchor Equities, Ltd. v. Joya*, 160 Ariz. 463, 773 P.2d 1022, 1025 (1989) ("Apparent authority is created when the principal's conduct leads a third party to reasonably believe that he has authorized his agent to take the actions or make the representations in question.") (citing *Miller*, 739 P.2d at 810). By granting TSMA express actual authority to sell its insurance policies, Preferred National reasonably led Universal Premium to believe that TSMA was authorized to assist insureds in obtaining legitimate premium financing and thereby to make truthful representations in premium finance agreements on its behalf.

6. The court reaches this conclusion despite the fact that many of the drafts prepared in connection with the finance agreements were made payable to "S.M.A." as opposed to "T.S.M.A." In addition, the court reaches this conclusion despite the fact that Universal Premium did not adhere strictly to its procedural guidelines in dealing with TSMA. The evidence shows that Universal Premium exercised reasonable care and prudence in dealing with TSMA.

Plaintiff's Exhibit 14) setting forth the amount of prejudgment interest due with respect to each individual finance agreement. Defendant shall have five (5) days thereafter to file any response. No judgment shall be entered in this case prior to the time the court makes a final determination concerning the appropriate award of prejudgment interest.

Copies of this order shall be transmitted to counsel of record for the parties.

**IT IS SO ORDERED.**